

FILED & ENTERED

OCT 19 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY craig        DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re<br><br>Wilbert Mauricio Henriquez<br><br>                 Debtor(s). | Case No.: 6:16-bk-11051 -MW<br><br>Chapter: 7<br><br>Adv. No: 6:16-ap-01072 |
| Vokshori Law Group, APLC,<br><br>                 Plaintiff(s),<br><br>   v.<br><br>Wilbert Mauricio Henriquez<br><br>                Defendant(s). | **MEMORANDUM DECISION AND ORDER**<br><br>Date:      October 4, 2016<br>Time:     9:00 a.m.<br>Place:    411 West Fourth Street<br>             Courtroom 6C<br>             Santa Ana, CA 92701 |

This adversary proceeding came on for trial on October 4, 2016 to determine whether a debt allegedly owed to plaintiff Vokshori Law Group, A Professional Law Corporation ("Plaintiff") by defendant-debtor Wilbert Mauricio Henriquez ("Defendant") is excepted from discharge pursuant to 11 U.S.C. §§

1  523(a)(2)(A) and/or 523(a)(2)(C)(i)(I).

2  The Court has subject matter jurisdiction over this proceeding pursuant to

3  28 U.S.C. §§ 157, 1334 and General Order No. 13-05, filed July 1, 2013, of the United

4  States District Court for the Central District of California.  This is a core proceeding

5  under 28 U.S.C. § 157(b)(2)(B), (I).

6  On the record, each of Plaintiff and Defendant consented to this Court's

7  final determination of this matter under the rule of *Stern v. Marshall,* 564 U.S. 462, 131

8  S. Ct. 2594 (2011) and *Wellness International, Ltd. v. Shariff*, 135 S. Ct. 1932 (2015)

9  and waived any right to a jury trial.

10  **FINDINGS OF FACT**

11  This matter involves legal fees and expenses allegedly owed by

12  Defendant to Plaintiff that were incurred in connection with failed efforts to modify a

13  secured loan on real property located at 5937 Paramount Drive, Riverside, California

14  owned by Defendant (the "Riverside Property").  Defendant's principal contention is that

15  he does not owe these fees and expenses because the loan modification failed and it

16  was agreed at the outset that fees and expenses would be payable only if the loan

17  modification was successful.  Plaintiff argues that the terms of the engagement clearly

18  specified the fees and expenses were payable irrespective of whether the loan

19  modification efforts succeeded or failed and, further, that the debt is excepted from

20  discharge because (1) Defendant never intended to pay the fees and expenses charged

21  by Plaintiff, even though promising to do so in writing and (2) the fees and expenses

22  constitute "consumer debts . . . for luxury . . . services incurred by an individual debtor

23  on or within 90 days before the order for relief" within the meaning of 11 U.S.C. §

24  523(a)(2)(C)(i)(I).

25  Defendant contacted Plaintiff's law office in or about February 2015 about

26  engaging Plaintiff to obtain a loan modification with respect to the secured loan held by

27  Bank of America on the Riverside Property.  At that point in time he had not made a

28  payment on the loan in approximately two years.[1]  Defendant testified that Plaintiff's

---

[1] Defendant's Exhibit B, page 1 ("For informational purposes, our records indicate that the loan is paid through the March 2013 installment").

1  employee Phil Alvarez told him he wouldn't have to pay Plaintiff unless the loan

2  modification was successful.[2]

3        Plaintiff and Defendant decided to move forward with the engagement

4  and, on February 19, 2015 at 2:01 p.m. Pacific Time, Plaintiff electronically transmitted

5  to Defendant a 9-page Vokshori Law Group Legal Services Agreement (the "LSA") via a

6  software program named "DocuSign."[3]  The DocuSign print out shows that Defendant

7  viewed the LSA 47 minutes later at 2:48 p.m. and signed it about 90 minutes after

8  midnight the next day, February 20, 2015, at 1:28 a.m.[4]  The DocuSign program has a

9  feature for initialing on each page of a legal document, and this feature was deployed by

10  Plaintiff in its electronic transmission of the LSA to Defendant.  Each and every one of

11  the nine pages of the LSA is initialed by Defendant.[5]

12        Numbered paragraph 3 of the LSA required Plaintiff to provide a long list

13  of loan modification-related services to Defendant occupying nearly a full page of the

14  LSA.  Numbered paragraph 4 on page 3 of 9 sets forth the "TOTAL FEES" and required

15  Defendant to pay a flat fee of $2,400 plus a monthly maintenance fee of $249 per month

16  should the representation last longer than four months.

17        Immediately below the two paragraphs describing the flat fee of $2,400

18  and the monthly maintenance fee of $249 per month are the following provisions:

19

20        The Flat Fees and Monthly Maintenance Fees as described
above are owed to LAW FIRM irrespective of any outcome
21  or result.

22        Legal Fees Are Due Upon:
(1) An approval of a loan modification by CLIENT's lender;
23  (2) A rejection of a loan modification by CLIENT's lender; (3)
A cancellation by CLIENT of LAW FIRM's services; or (4) A
24  withdrawal of representation by LAW FIRM for reasonable
25  cause.

26  The Court regards the placement on the page of the two paragraphs quoted in full

27  immediately above as a matter of key importance.  Anyone presented with this LSA

28

---

[2] Reporter's Transcript ("RT") at page 109, lines 22-25, page 110, line 1.
[3] Plaintiff's Exhibits 1 and  4.
[4] Plaintiff's Exhibit 4.  It appears the signature was made by Defendant using his finger on the screen of
     the electronic device he used to view the LSA.  RT at pages 33-34.
[5] Plaintiff's Exhibit 1.

1  who wanted to see how much he would owe under the agreement would necessarily

2  have to look at numbered paragraph 4 on page 3 of 9 and at that point the two

3  paragraphs quoted in full above would be clearly in the field of vision.  In other words,

4  for all practical purposes (excepting perhaps a severely visually impaired person) it

5  would be quite difficult to look at the LSA to determine how much one would owe for

6  Plaintiff's services without also seeing the LSA provisions indicating that the fees would

7  be owed "irrespective of any outcome or result" and, further, that the fees would be

8  payable if the loan modification were rejected.

9          Defendant initialed page 3 of 9 of the LSA.

10         As if this were not enough, numbered paragraph 7 on page 4 of 9, entitled

11  "DISCLAIMER OF GUARANTEE:", provides as follows:  "Nothing in this Agreement

12  and nothing in LAW FIRM's, or its employees', statements to Client will be construed

13  as a promise or guarantee about the outcome of this matter. . . Client acknowledges

14  that Law Firm has made no promise or guarantees about the outcome."  Defendant

15  also initialed this page.

16         On LSA page 8 of 9, numbered paragraph 15, entitled "IMPORTANT

17  NOTICES   NOTICE REQUIRED BY LAW" sets forth in boldfaced large font text the

18  notice specifically required by California Civil Code section 2944.6 to be provided to a

19  borrower seeking loan modification services.  This text essentially notifies a borrower

20  that it is not necessary to pay a third party to arrange for loan modification or

21  forbearance because the borrower can directly contact the lender or ask nonprofit

22  housing counseling agencies for help.  Defendant also initialed page 8 of 9.

23         After the execution of the LSA by the client/borrower, the next step in the

24  engagement was to send the client/ borrower a list of documents to be provided to the

25  lender in connection with a loan modification request.  Plaintiff's practice was to allow

26  for some time to pass and for the collection of documents from the client/borrower

27  before executing the LSA on Plaintiff's behalf.  The LSA that comprises a portion of

28  Plaintiff's Exhibit 1 (and is also Defendant's Exhibit D) was manually signed by N.

1  Stephen Vokshori, Esq. on Plaintiff's behalf on June 1, 2015.

2  In the meantime, Plaintiff had been working to collect necessary

3  documents from Defendant.  Email correspondence between Defendant and Plaintiff's

4  employees (set forth in Defendant's Exhibit A) show that on February 27, 2015 Plaintiff

5  sent Defendant a list of nine types of documents and requested him to "[p]lease work

6  on these documents and send them into the office as soon as possible.  The quicker

7  we get your documents, the quicker we get to process your loan modification and the

8  faster we get you the help you need.  Please make sure to send these documents at

9  the earliest time possible. . . Thank you so very much for your time."[6]

10  About one month later, on March 20, 2015, Plaintiff followed up with

11  another email again requesting six of the nine items previously requested.  Three days

12  later, on March 23, 2015, Plaintiff followed up with yet another urgent request asking

13  Defendant to send in the itemized documents listed in the February 27 email.  As of

14  July 1, 2015, after repeated additional emails, Plaintiff was still missing documents that

15  Defendant had been asked to provide over four months earlier, namely, his 2014 tax

16  returns.

17  A loan modification application was transmitted via fax by Plaintiff to Bank

18  of America on or about August 17, 2015.  The application listed Defendant's mother,

19  Leonor Henriquez, as a co-borrower.  An attachment indicated that she did not live on

20  the Riverside Property and did not contribute to household expenses.  Bank of America

21  acknowledged receipt of the application by letter dated September 16, 2015.

22  Defendant apparently wanted to distance his mother from the loan

23  modification process.  When Bank of America became aware of the issues, it

24  requested that Defendant furnish a quitclaim deed taking his mother off of title to the

25  Riverside Property.  This additional complexity created further delay in the process.

26  Plaintiff took the position that preparing a quitclaim deed, obtaining the necessary

27  signatures and notarizations and recording the instrument were not included in the

28  services it had agreed to provide.

[6] Defendant's Exhibit A, page 1.

By early fall 2015 Defendant was becoming increasingly frustrated with Plaintiff.  He sent an email on October 3, 2015 to Plaintiff's employee Anhel Farias that reads in relevant part as follows:

> So why do I have a lawyer with you guys and going to end up paying you guys $2400 for?  Basically so you can just send the lender my papers I fax to you guys . . . I found someone else to do everything not just send to my lender what I sent you . . . Tell your boss to take 15 mins. Of his time to help me fill this out [i.e., the quitclaim deed].  Or I'm going to hire someone else to do everything for less money. **After my modification goes through I'm filing bankruptcy so feel free to charge me anything you want for something you guys haven't done. . .** [bold-faced type added by the Court].

The relationship between Plaintiff and Defendant appears to have gone from bad to worse at some point following this communication.  There is a gap in the email record introduced into evidence in the November/early December 2015 time period.  On December 16, 2015, Plaintiff's employee Anhel Farias sent an email to Defendant informing him that "the lender closed out your loan modification application for failure to provide the needed documents in a timely manner," that Plaintiff had closed out his file and that "[a]s a friendly reminder, you still owe VLG fees for the work performed over the past months regarding your loan modification."[7]

Defendant engaged bankruptcy counsel and filed a chapter 7 petition on February 8, 2016.  Indebtedness of $3,894.00 to Plaintiff was scheduled as a disputed general unsecured claim, incurred as of February 20, 2015 (the date Defendant signed the LSA per DocuSign).  Chapter 7 Petition, Docket No. 1, filed February 8, 2016 at page 34 of 60.

Plaintiff timely commenced this adversary proceeding on March 22, 2016. Defendant answered the complaint on April 22, 2016.  The pretrial conference was held on August 18, 2016.

\\\

---

[7] Defendant's Exhibit A, page 19.

1

## CONCLUSIONS OF LAW

2       Plaintiff asks the Court to determine that Defendant's debt to Plaintiff of

3   $3,894.00 arising under the LSA is excepted from discharge under 11 U.S.C. §

4   523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(C)(i)(I).

5       Defendant contends that Plaintiff should take nothing by his complaint for

6   the following reasons:  (1) there is no debt because the agreement between the parties

7   is that Plaintiff is entitled to collect its fee only if a loan modification is successful, and

8   the loan modification failed; (2) assuming arguendo that a debt exists, the debt is

9   dischargeable because Defendant always intended to pay if the loan modification was

10  successful; (3) Plaintiff loses because Plaintiff failed to properly provide the disclosures

11  required by California Civil Code section 2944.6; and (4) Plaintiff loses because it did

12  not fully perform each and every service it was required to perform under California

13  Civil Code section 2944.7 – and therefore cannot legally charge Defendant because

14  one of the services it was required to perform was obtaining a loan modification, and

15  this never occurred.  (Regarding item (3), the Court notes that Defendant cites no

16  authority for the proposition that a failure to comply with section 2944.6 results in a

17  forfeiture of fees – as opposed to the imposition of criminal sanctions – but as it turns

18  out this is not of great moment in the case).

19      ### 1.  <u>Defendant's Liability on Plaintiff's Claim</u>.

20      Plaintiff and Defendant agree that (1) there was a legally-enforceable

21  contract between them, (2) Defendant at some point in time signed the LSA, and (3)

22  Defendant was obligated to pay Plaintiff the amount of fees and costs specified in the

23  LSA if Plaintiff successfully obtained a loan modification for Defendant.  The main point

24  of disagreement between them is Defendant's contention that, in view of his

25  conversation with Plaintiff's employee Phil Alvarez, he was obligated to pay Plaintiff

26  only if Plaintiff was successful in obtaining a loan modification.  Implied, although not

27  explicitly stated in Defendant's argument, is the assumption that Mr. Alvarez's

28  promises override and take precedence over very clear explicit provisions in the LSA

that Defendant owed the fees irrespective of whether Plaintiff was successful in

obtaining a loan modification.

Neither party called Mr. Alvarez as a witness at trial.

The Court regards Defendant's testimony concerning his conversation

with Mr. Alvarez as <u>not</u> credible for the following reasons.  Defendant had a copy of the

LSA as of approximately mid-February 2015.  The LSA clearly provided in plain non-

legalese terms that (a) there were no guarantees Plaintiff would be successful in

obtaining a loan modification, (b) the Plaintiff's fees and costs were payable

irrespective of whether a loan modification was obtained, and (c) in terms of the timing

of the required payment, payment was due upon obtaining the loan modification or

upon rejection of the loan modification by the lender.  Despite these clear provisions,

Defendant did not object orally or in writing to the LSA's terms in this regard after

receiving the LSA.  Instead, he signed the LSA about 12 hours after receiving it (and

personally initialed each and every page, including the page stating the fees and

expenses were payable irrespective of outcome).  Nor did he object orally or in writing

in June 2015 when a copy of the LSA signed by Mr. Vokshori on Plaintiff's behalf was

sent to him.  And, most persuasive of all, he did not object orally or in writing at the

time of his October 3, 2015 email to Anhel Farias in which he expressed extreme

dissatisfaction with the manner in which events were proceeding.  These repeated

failures to object to a highly material term of the LSA create a strong inference that he

knew all along he had to pay even if a loan modification failed and that the purported

conversation with Mr. Alvarez is a long-after-the-fact concoction devised as part of a

last-ditch effort to escape liability for fees and costs he had agreed to pay.

The Court is strengthened in this conclusion by the highly contradictory

nature of Defendant's testimony at trial. At one point during the trial Defendant testified

that he signed the LSA digitally on February 20, 2015.[8]  A few minutes later he testified

he signed it on June 1, 2015.[9]  Having observed his demeanor, the Court concludes

Defendant's testimony concerning the statement purportedly made by Mr. Alvarez that

---

[8] RT at page 98, lines 12-15.
[9] RT at page 100, lines 16-17.

he did not have to pay if a loan modification was not obtained simply is not credible.

Plaintiff's trial witness Nadia Sommereyns testified to Plaintiff's ironclad business practice of emphasizing to prospective clients that no results were guaranteed and that fees and expenses were payable irrespective of whether a loan modification was obtained or not.[10]  The Court regards this testimony as credible and concludes that it supports the conclusion that Mr. Alvarez never made the statements attributed to him by Defendant to the effect that fees and expenses were payable only if a loan modification was obtained.

Defendant further contends that the LSA did not go into effect in mid-February 2015 but instead in June 2015 when Mr. Vokshori signed it.  Even if this is true, it does not alter the fact that the LSA provides that fees and expenses are payable without regard to the outcome of Plaintiff's loan modification efforts.

For these reasons, the Court concludes that the LSA controls the terms of contract between the parties and that no provision of that contract relieves Defendant of the obligation to pay Plaintiff's fees and expenses even if loan modification efforts failed.  Thus, Defendant is indebted to Plaintiff in the amount of $3,894.00 plus, if applicable, attorneys' fees.

## 2.    Exception to Discharge.

11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt for services to the extent obtained by false pretenses, a false representation or actual fraud.  The creditor bears the burden of demonstrating by a preponderance of the evidence each of the following five elements:  (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the representation or omission; (3) an intent to deceive; (4) the creditor's justifiable reliance on the representation or conduct; and (5) damage to the creditor proximately caused by reliance on the debtor's representations or conduct.  *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010); *Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (9th Cir. BAP 2009).

---

[10] RT at page 73, lines 10-18.

Numbered paragraph 4 of the LSA states "CLIENT agrees to pay a discounted flat fee of $2400 for this representation . . ." and that "CLIENT shall pay an ongoing flat monthly 'maintenance' fee of $249" in the event the representation exceeds four months.  The Court interprets these provisions as both covenants and representations.[11]  A person who enters into a contract and promises to pay the other contracting party impliedly represents that he has the present intention of paying and if he or she does not have this present intention there is a misrepresentation.  Defendant was not only promising to pay, he was representing that he would pay if required to do so under the LSA's terms.[12]  This representation was false because, as discussed in greater detail below, Defendant had no intention of paying Plaintiff at the time the LSA took effect (whether in February 2015 as contended by Plaintiff or in May/June 2015 as contended by Defendant) in the event Plaintiff was unsuccessful in getting the Bank of America loan on the Riverside Property modified.

An alternative analysis, which the Court also adopts, is that Defendant made a fraudulent omission by not telling Plaintiff that he had no intention of paying if loan modification efforts were unsuccessful.  The omission is fraudulent in view of his express written promise to pay irrespective of whether loan modification efforts were successful.

Defendant strenuously argues that he intended all along to pay Plaintiff if the loan was modified and that he understood the deal to be that no payment would be due if the loan modification failed (basing this on the conversation with Mr. Alvarez).  Thus, he did not know he was making a misrepresentation and, in any event, had no intent to deceive Plaintiff.  The Court rejects these arguments largely for the reasons already discussed above.  The facts that Defendant received a full copy of the LSA via DocuSign at about 2:00 p.m. on February 19, 2015, that he had about 12 hours to

---

[11] *See Arciniega v. Clark (In re Arciniega)*, BAP No. CC-15-1123-KiGD, 2016 Bankr. LEXIS 343 (9th Cir. BAP Feb. 3, 2016) (debtor's contractual promise to "take all necessary measures to pay off the existing VA loan" interpreted as a representation).

[12] An alternative analysis, reaching the same end point result, is that a person who promises to do *x* makes a fraudulent omission if, at the time he or she promises to do *x,* he or she has no intention of doing *x.* In any event, it is clear that a promise made with a positive intent not to perform or without a present intent to perform satisfies 11 U.S.C. § 523(a)(2)(A).  *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir. 1989).

1    review it before signing it on February 20, 2015 at 1:28 a.m., that he initialed each and

2    every page, that the LSA provision requiring payment irrespective of success or failure

3    is placed immediately below the LSA provisions describing the fees due (people

4    signing contracts generally look at the provisions describing how much they are

5    required to pay, even if they look at little else), and that he never orally or in writing

6    complained about the disparity between the LSA's terms and what he was supposedly

7    promised by Mr. Alvarez even when he was extremely unhappy with Plaintiff's

8    performance under the LSA all lead to the conclusion that he well knew at the time he

9    signed the LSA and initialed each page that he would have to pay even if LSA was

10   unsuccessful and that he intended to deceive Plaintiff about his intentions so that they

11   would exert their efforts and try to get his loan modified.  Additionally, Defendant's

12   statement in the October 3, 2015 email "[a]fter my modification goes through I'm filing

13   bankruptcy so feel free to charge me anything you want for something you guys

14   haven't done" shows that he had no intention of paying Plaintiff at that time, and this is

15   some evidence that he likewise had no intention of paying Plaintiff at any time unless a

16   loan modification was obtained.[13]  Accordingly, the second and third of the five

17   requirements described above are satisfied.

18            The fourth element of fraud as an exception to discharge requires that the

19   bankruptcy court find that the creditor justifiably relied on a debtor's false statements or

20   misrepresentations.  *Field v. Mans*, 516 U.S. 59, 74-75, 116 S. Ct. 437 (1995).

21   Justifiable reliance is measured on a subjective standard, which turns on a person's

22   knowledge under the particular circumstances.  *Citibank (South Dakota), N.A. v.*

23   *Eashai (In re Eashai)*, 87 F.3d 1082, 1090 (9th Cir. 1996).  Reliance can be presumed

24   where the fraud primarily involves omissions.  *Bershadskiy v. Rodeo Realty, Inc. (In re*

25   *Bershadskiy)*, BAP No. CC-12-1452-TaKuKi, 2013 Bankr. LEXIS 4597 (9th Cir. BAP

26   Oct. 15, 2013) (unpublished but cited for persuasive value).  Because direct proof of

27

28

---

[13] The reference to "after my loan modification goes through" may be an inartful way of referring to a loan
modification rejection.  It also may be a reference to obtaining a loan modification by using a
different loan modification services provider.  Finally, it may also mean that Defendant as of
October 3, 2015 had no intention of paying Plaintiff even if Plaintiff successfully obtained a loan
modification for him.  None of these interpretations is favorable to Defendant.

1  reliance is difficult, actual reliance may be proven by circumstantial evidence of

2  reliance.  *In re Faulk*, 69 B.R. 743, 749 (Bankr. N.D. Ind. 1986).

3          Plaintiff justifiably relied on Defendant's representation in the LSA that he

4  had the intention of paying the amounts due under the LSA irrespective of whether

5  loan modification efforts were successful.  The reliance was justifiable because (1)

6  Defendant signed the LSA, (2) Defendant initialed each and every page of the LSA and

7  (3) contemporaneous with these actions, Defendant did not manifest, either orally or in

8  writing, any disagreement with the LSA provision that the obligation to pay was not

9  contingent on successfully obtaining a loan modification.

10          Under the Court's alternative analysis that a fraudulent omission occurred

11  when Defendant failed to inform Plaintiff at the time he signed the LSA that he had no

12  intention of paying if loan modification efforts failed, reliance is presumed and is

13  justifiable for the reasons discussed in the preceding paragraph.

14          The losses proximately caused by Defendant's misrepresentation or

15  fraudulent omission are the amounts due under the LSA.[14]  Defendant's counsel

16  conceded as much in closing argument.[15]  Based upon the totality of the evidence,

17  there is no doubt that Plaintiff would not have taken this matter on if Defendant had

18  refused to sign the LSA or, alternatively, if Defendant had told Plaintiff that,

19  notwithstanding the LSA, he was not going to pay Plaintiff if the loan modification

20  efforts failed.

21      **3.    Alleged Statutory Defenses.**

22          Defendant argues that Plaintiff's alleged failure to comply with the terms of

23  two statutory provisions, California Civil Code section 2944.6 and California Civil Code

24  section 2944.7, fatally undermine Plaintiff's causes of action herein.

25          Section 2944.6 requires any person who offers to perform a loan

26  modification to provide a specific notice to the borrower "prior to entering into any fee

27  agreement with the borrower."  The required notice appears in numbered paragraph 15

28  of the LSA.[16]  Irrespective of whether the LSA was technically entered into in February

---

[14] RT at page 32, lines 11-13.
[15] RT at page 129, lines 5-6.
[16] Plaintiff's Exhibit 1 at page 12.

1  2015 or June 2015, it is clear that Plaintiff complied with section 2944.6 by providing

2  Defendant with the required notice "prior to entering into any fee agreement."

3  Section 2944.7 criminalizes any act to claim, demand, charge, collect or

4  receive any compensation for loan modification services until after full performance of

5  the loan  modification services.  Here, the record shows that Plaintiff did not bill

6  Defendant or attempt in any manner to collect fees from Defendant until after the loan

7  modification request had been rejected by the lender and after full performance of

8  services had occurred.  Specifically, the first request for payment appears to have been

9  made in the December 16, 2015 email from Anhel Farias to Defendant.  By that time

10  the lender had rejected the modification and Plaintiff had closed out Defendant's file.[17]

11  Consequently, each of Defendant's alleged statutory defenses fails.

12  **CONCLUSION**

13  For the reasons stated above, the Court determines that the indebtedness

14  of Defendant to Plaintiff arising from the LSA is excepted from discharge pursuant to

15  11 U.S.C. § 523(a)(2)(A).  In view of this disposition, the Court does not reach

16  Plaintiff's arguments under 11 U.S.C. § 523(a)(2)(C).

17  Plaintiff has proven up a claim of $3,894.00.  If Plaintiff believes this

18  amount should be augmented by attorneys' fees and expenses pursuant to numbered

19  paragraph 10 of the LSA or under any other provision of law or statute, Plaintiff shall

20  file a pleading supported by one or more declarations advancing such argument on or

21  before November 15, 2016.  Defendant may file a reply on or before November 29,

22  2016, whereupon the Court will review the pleadings and issue an order with respect to

23  this matter.

24  If Plaintiff elects not to pursue attorneys' fees and costs, Plaintiff shall

25  lodge a form of judgment within 14 days of the date of entry of this Memorandum

26  Decision and Order.

27  \\\

28  \\\

---

[17] Defendant's Exhibit A, page 19.

**IT IS SO ORDERED.**

###

Date: October 19, 2016

Mark S. Wallace
United States Bankruptcy Judge